IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| SHAINA LACINA,<br><br>               Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security<br><br>             Defendant. | No. 3:09-cv-00124<br><br><br>**ORDER** |

This matter comes before the Court pursuant to briefs on the merits of this application for disability insurance benefits and supplemental security income. The Court finds that the decision of the Social Security Administration is supported by substantial evidence. The final decision of the Commission of Social Security is affirmed and this matter is dismissed.

## I. PROCEDURAL BACKGROUND

Plaintiff Shaina Lacina (hereinafter "Lacina") filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on June 12, 2006, alleging she became unable to work on December 31, 2002. (Tr. 104–15.) She asserted her disabling condition began on January 1, 1993. (Tr. 104.) The Social Security Administration ("SSA") denied Lacina's application initially and again upon reconsideration. (Tr. 54–47, 59–62.) Administrative Law Judge ("ALJ") Debra Bice held a hearing on September 3, 2008. (Tr. 16–49.) The ALJ denied Lacina's appeal on January 28, 2009. (Tr. 5–15.) Lacina filed a request for review on March 30, 2009. (Tr. 99–103.) The Appeals Council denied her request for review on June 25, 2009. (Tr. 1–4.) Lacina thereafter filed this action for judicial review on August 21, 2009. (Dkt. 1.)

## II. FACTUAL BACKGROUND

At the time of the hearing, Lacina was twenty-eight years old.  She was twenty-two at the time of her alleged disability onset date.  Lacina graduated from high school and has taken some college course work.  (Tr. 20–21.)  Her vocationally relevant experience includes work as a cashier, customer service clerk, and commercial cleaner.  (Tr. 43, 45, 116–18.)

### A. Relevant Medical History

Lacina alleges disability based on several mental health conditions.  These include: anxiety, panic attacks, attention deficit disorder, and depression.  (Tr. 130, 146.)  Lacina has a history of mental illness beginning at the age of thirteen, when she was diagnosed with major depressive disorder.  (Tr. 292.)  At age nineteen, she was also diagnosed with panic disorder and anxiety.  (Tr. 292.)

From April 17, 2002 to July 30, 2003, her treating physician was Dr. Robert Wesner.  (Tr. 422–27.)  During this time period, her Global Assessment Function ("GAF")[1] scores ranged from 60 to 75.  Dr. Wesner prescribed Lacina the prescription

---

[1]GAF is a numerical scale (0–100) mental health professions use to subjectively rate the social, occupational, and psychological functioning of adults.  See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32–34 (4th ed. revision 2000) (DSM-IV-TR).  A GAF between 11 and 20 indicates "some danger of hurting oneself or others (e.g., suicidal attempts without clear expectation of death; frequent violent; manic excitement) OR occasionally failure to maintain minimum personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."

A GAF between 21 and 30 indicates behavior may be "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job; home or friends)."

A GAF between 31 and 40 indicates some "impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; . . .)."

A GAF between 41 and 60 indicates "serious symptoms (e.g., suicial ideation, severe

drugs Adderall and Prozac, with dosages ranging from 20 mg to 50 mg.  (Tr. 422–24.) Lacina was working at Coralville Bay pet store at the time.  (Tr. 422–27.)  Her GAF scores were 65-70 for her final two visits and Dr. Wesner commented that through treatment and medication, "Shaina has slowly gained insight as to what it takes to make it in the working world."  (Tr. 427.)

Lacina began seeing Dr. Kimberly Sheff in December 2003.  On Lacina's first visit on December 8, 2003, she reported that her last panic attack had been approximately one month earlier.  (Tr. 444.)  During a panic attack, her reported symptoms included palpitations, sweating, and loss of breath.  (Id.)  Dr. Sheff assigned Lacina an initial GAF score of 55.  (Tr. 445.)  At Lacina's next visit on February 17, 2004, Dr. Sheff noted that Lacina's GAF had increased to 80, but that she was non-compliant with taking her medication and with her appointments at the community mental health center ("CMHC"). (Tr. 442.)  Although Lacina missed one appointment on April 27, 2004 (Tr. 440), her GAF remained at 80 over the next several visits.  (Tr. 437–39.)   Lacina reported on one visit that she was "off the adderall for a week and . . . had 4 anxiety attacks . . . last[ing] anywhere from 5 to 45 minutes."  (Tr. 439.)  After a two-week trip to Japan for Japanese animation classes (Tr. 437), Lacina's GAF scores regressed to 60 and 75.  (Tr. 434–36.) Her GAF score increased to 85 on April 4, 2005.  (Tr. 433.)

---

obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

A GAF between 51 and 60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functions (e.g., few friends, conflicts with peers or co-workers)."

A GAF between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household)."

Lastly, a GAF between 71 and 80 indicates that if there are any symptoms, they are "transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork.)."

On May 26, 2005, Lacina was admitted to the University of Iowa Hospitals and Clinics ("UIHC") for five days because of suicidal ideation and cutting behavior. (Tr. 207–08.) She stated that her depressive symptoms had been increasing over the past two to three weeks. (Id.) In Lacina's psychiatric intake interview, she indicated that her "severe" panic attacks occur intermittently and "tend to occur at times when she is more upset than usual." (Tr. 209.) She stated that her last panic attack occurred two weeks before admission. (Tr. 204.) Dr. William Coryell assessed Lacina a GAF score of 42 upon admission to the psychiatric outpatient facility (Tr. 209), although she had presented with a GAF score of 30 in the emergency room. (Tr. 208.) Lacina's GAF score was 48 upon discharge on May 31, 2005. (Tr. 204.)

Lacina underwent a neuropsychiatric evaluation on July 13, 2005 to assess for attention deficit disorder. (Tr. 201.) The reviewer opined that Lacina was of average intelligence, her attention/concentration was average, her perceptual abilities were superior, her comprehension of written and spoken language was intact, and her verbal reasoning was average. (Tr. 202.) The physician concluded that "[t]he results of the evaluation suggest that the patient is performing adequately without medication, although it is unknown how she would perform while taking the medication. . . . It is concerning, however, that the patient's depression falls in the severely depressed range, and her follow-up psychiatric care is unclear." (Tr. 203.)

At her first visit with Dr. Sheff on July 20, 2005, following her hospitalization and release from UIHC, Lacina reported that she had been out of her Adderall medication for three weeks and had forgotten to take her Zoloft. (Tr. 432.) Lacina had quit her job while she was hospitalized because "it was just too high anxiety." (Tr. 432.) At this visit, and for the next three following visits with Dr. Sheff, Lacina's GAF score was 75. (Tr. 429–32.) Lacina's last treatment with Dr. Sheff was on September 22, 2005. (Tr. 429.)

Lacina then transferred to the Mid-Eastern Iowa Community Mental Health Center,

where she was seen as a patient on a fairly regular basis from October 26, 2005 to May, 2008. (Tr. 211–19, 247–62) Her treating physician, Dr. Paul Pomrehn, initially diagnosed Lacina with a GAF of 50-55, her last panic attack having occurred in September. (Tr. 217–18.) Lacina's GAF scores increased slightly to 55-60 over the next couple visits. (Tr. 213, 216.) Dr. Pomrehn remarked in his notes on October 9, 2006, that "I reiterated the need for her to show up for her appointments and to not expect us to fill her prescriptions for Adderall without her keeping appointments." (Tr. 247.) Her visits were otherwise unremarkable, although notes from her psychotherapist also indicate Lacina had compliance issues related to taking her medication. (Tr. 249–53.) Lacina again visited the emergency room on July 26, 2006, as a result of suffering from a panic attack. (Tr. 221.) She received a dose of Ativan and was released. (Id.)

Lacina also began seeing a psychotherapist, James Smith, on December 19, 2006, and these visits continued until August 28, 2007. (Tr. 349–76.) At these sessions, Lacina would receive treatment for learning how to better manage her medications and appointments. (Id.) Lacina often arrived very tired and in an anxious mood. (Tr. 357.) The therapist worked with Lacina's socialization skills and management of anxiety symptoms. (Tr. 359.) But, for example, on March 12, 2007, after Lacina had been informed that applying for disability benefits could take up to a year, she had begun "cutting herself" again "as a means of coping with anxiety and isolation." (Tr. 361.)

On April 29, 2007, Lacina was admitted for the third time to UIHC after an overdose combined with alcohol. (Tr. 288.) She told hospital staff that she took five Ativan tablets and drank alcohol "to sleep a long, long time, but . . . not to kill herself." (Id.) She was admitted to the psychiatric ward with a GAF score of 15. (Tr. 294.) She reported having panic attacks "only occasionally, about once a month, and only in stressful situations." (Tr. 299.) Lacina was discharged on May 3, 2007 to partial psychiatric hospitalization. (Tr. 298.) Her GAF score was 47 on discharge. (Tr. 302.)

5

During, Lacina's first outpatient visit on May 4, 2007, she described her panic attacks as occurring twice per month, "characterized by acute onset of rapid breathing, increased heart rate, fingers tingling, feeling dizzy, sense of doom, and feeling like she is near to passing out." (Tr. 304.)  While Lacina stated she had never actually passed out, she has "crumpled" to the floor while the attacks last (between fifteen to thirty minutes). (Id.)  When specifically questioned about applying for and receiving disability benefits or continuing to work, Lacina responded that it was "a 'good question' and says it would depend on how much money she made."  (Id.)  Her GAF score remained 47 on her next outpatient visit on May 10, 2007, although she continued to have problems remembering to take her medication. (Tr. 322.)  Lacina's GAF scores held steady at 47 over the next two visits and increased slightly to 49 for the following several visits.  (Tr. 311, 313, 315, 317.)   During her course of outpatient psychiatric treatment, Lacina also visited the emergency room for sharp neck pain on May 30, 2007. (Tr. 318.)  Lacina was discharged from the outpatient psychiatric treatment on June 7, 2007, with a GAF score of 50.  (Tr. 322–23.)

After this third hospitalization, Lacina continued her visits to the CMHC until May 12, 2008, with GAF scores ranging from 50–55.  (Tr. 337, 339, 343, 345, 347.)  Lacina reported an increasing frequency of panic attacks from August 20, 2007, to the date of the hearing. (Tr. 337, 339.)  The physician notes from February 2, 2008, indicate that Lacina was "terminated from therapy at the center because she has not been keeping her appointments", although the notes do not specify which center or program.  (Tr. 343.)  Lacina's therapist wrote her a doctor's note because she was missing classes as a result of anxiety.  (Tr. 340.)  Lacina also continually expressed her desire to return to the partial hospitalization program because she was having difficulty with anxiety and coping with stress. (Tr. 345–47.)  During her last visit on August 28, 2007 to her psychotherapist at the CMHC, Lacina had a "constricted affect and an anxious somewhat irritable mood,"

but she reported that she had begun a course at a local community college and was continuing to work for her parents weekly.  (Tr. 375.)

### B. Consultative Examinations

On July 27, 2006, Myrna Tashner, Ed.D., completed a mental residual functional capacity assessment on Lacina.  (Tr. 224–41.)  Dr. Tashner found that Lacina was only moderately limited with her attention span and her ability to adapt to changes in work settings.  (Tr. 224–25.)  She also had only mild restriction of daily living activities, difficulty in maintaining social functioning, and moderate difficulties with maintaining concentration.  (Tr. 238.)  Lacina did not have episodes of decompensation.  (Id.)  Dr. Tashner remarked on Lacina's "inconsistent f[ollow]-up w/ her med checks and questionable med compliance as she was sometimes w/o or halving her dosage."  (Tr. 226.)  Dr. Tashner concluded that Lacina did not meet a listing for a disability determination.  (Id.)  John Garfield, Ph.D. conducted another mental assessment on January 29, 2007 and made the same findings as Dr. Tashner.  (Tr. 266–67.)

Hospital records from February 11, 2008, to July 11, 2008, also indicate that Lacina visited UIHC for a variety of minor ailments.[2]

### C. Hearing Testimony

ALJ Debra Bice held Lacina's hearing on September 3, 2008.  At the time of the hearing, Lacina was twenty-eight.  Vocational expert ("VE") Roger Marquardt and a

---

[2]For example, on February 11, 2008, Lacina visited the emergency room for a left thumb laceration, and came again due to injection site redness two days later.  (Tr. 416, 419.)  She was admitted for severe nausea and dry heaves on February 19, 2008.  (Tr. 411.)  Lacina was diagnosed with gallbladder disease on May 15, 2008 (Tr. 406) and was discharged on May 17, 2008.  (Tr. 393.)  She went to the emergency room again for abdominal pain on June 6, 2008.  (Tr. 386.)  Lacina had a preoperative visit for laparoscopic cholecystectomy on June 12, 2008, the surgery on June 20, 2008, and a postoperative visit on July 11, 2008.  (Tr. 379–85.)

witness for Lacina, Janice Cohenour, also testified.

Regarding her reaction to stress and anxiety, Lacina testified that she withdrew from college courses because she suffered from stress, panic attacks, and absenteeism. (Tr. 21.) She testified that her last job had been approximately two years prior and that she had stopped working because the work-related stress caused panic attacks. (Tr. 22.) She stated that she looked for other employment that was relatively low-stress, but that she was unable to find anything. (Id.)

As to her medical care, Lacina testified that she was seeing a psychiatrist on a fairly regular basis, but that she had recently "missed a lot of appointments." (Tr. 23.) She testified that she stopped seeing a counselor approximately one year ago because it was expensive and she was also missing those appointments. (Id.) She testified that she saw her psychiatrist, Dr. Pomrehn, for her depression, attention anxiety disorder ("ADD"), and anxiety. (Id.) She testified that her anxiety gave her "no to low energy, constant negative thoughts" and that her ADD resulted in "[s]evere memory loss, short attention span, [and an] inability to concentrate." (Tr. 24.) She testified that she had taken medication for ADD in the past but that she was not currently on medication; she was continuing to take medication for her depression. (Id.) Finally, Lacina testified that her anxiety resulted in her overreacting, feeling "tense, irritable, shaky, scared." (Tr. 25.) She stopped taking medication for her anxiety after she overdosed on it. (Id.) As to other limiting physical conditions, Lacina testified that she had a bad back and two failed bunionectomies. (Tr. 29.) Standing hurt her feet after several hours. (Id.)

Lacina testified that she usually went to bed at night at 4:00 a.m. and woke up at 4:30 p.m. (Id.) Also, she sometimes would not have the energy to bathe, dress, and shower, and would prepare herself only something "very simple" to eat. (Id.) She had low energy every day and only left her apartment a couple times a week. (Tr. 33.) She testified that she would sometimes use her computer for one to four hours a day, "chatting

online and browsing." (Tr. 26.) She would otherwise spend time with her family, friends, and pets. (Tr. 26–27.) Keeping her apartment clean, where she lived by herself, was also difficult because it gets "dirty really, really fast." (Tr. 28.) She also liked to do Japanese cartoon animation and had not finished more artwork because she lacked the energy. (Tr. 37–38.) Lacina testified that her life-skills person, Janice Cohenour, helped her with grocery shopping. (Tr. 28.) Ms. Cohenour also would assist Lacina once a week in filling out paperwork and getting her mail. (Tr. 34.) Lacina testified that she had lost her license as a result of operating a vehicle under the influence, but had since gotten her driver's license back. (Tr. 30–31.)

Lacina also testified about problems with her memory and her inability to remember important dates. (Tr. 29–30.) She stated that she has a hard time understanding people because her mind wanders and she cannot recall information. (Tr. 30.) When asked to elaborate about her panic attacks, Lacina testified that they occur "every couple of months" and can occur more frequently when she encounters conflict or difficult situations. (Tr. 35.)

The ALJ then asked witness Janice Cohenour questions about the assistance Ms. Cohenour provides to Lacina. (Tr. 39.) According to Ms. Cohenour, she assists Lacina in buying groceries, scheduling appointments, reminding her of appointments, reviewing her mail, filling out applications and paperwork, and remembering to pay her bills. (Id.) She testified that she does not help Lacina in taking care of her animals—a dog, two cats, a parrot, and several aquariums—but that Lacina lacked the motivation to clean her apartment unless she had a guest. (Tr. 40.) Ms. Cohenour stated that she had never witnessed Lacina suffer a "full-fledged panic attack, but I've seen her get very anxious and nervous and start to cry over something, but not to the extent that she has described." (Tr. 41.)

Next, the ALJ asked the vocational expert several questions. The first was:

9

> I'd like you to assume a person of the claimant's age,
> education and work experience as you've described it. I'd like
> you to further assume that this individual has no exertional
> limitations, but that they are limited to performing unskilled
> work that involves one to two step processes and no more than
> occasional changes in the work routine or process. Would she
> be able to perform any of her past work?

(Tr. 44.)   The VE answered yes, because she could perform her past work as a

commercial cleaner. (Tr. 44–45.) Other types of unskilled work would include work as

a stock checker and house cleaner as per the Dictionary of Occupational Titles ("DOT")

in the national economy. (Tr. 45.)

The ALJ then posed the next hypothetical:

> I'd like you to assume those same limitations, but further
> assume that the individual should not have contact with the
> public and only occasional contact with co-workers. Would
> that change your answer in any way?

(Id.) The VE indicated that these limitations would not change Lacina's ability to perform

her past work, but that—in his professional opinion—it could lower by at least fifty percent

the number of available jobs. (Tr. 45–46.) Additionally, the social limitations would "not

be unusual for the work . . . because it's a one and two-step process to work with no more

than occasional contact" with other co-workers or supervisors. (Tr. 46.)

The ALJ concluded by asking the VE if any of the jobs classified "as a production

rate" or having to keep up with competitive employment. (Tr. 46–47.) The VE answered

in the affirmative and stated that if the individual could not maintain a competitive

employment rate, then the small products assembler position would be eliminated. (Tr.

47.) Also, if the individual had to miss two or more days of work per month, then

employment "could not be sustained." (Id.)

Lacina's attorney asked the VE additional hypotheticals. First, the attorney added

to the hypotheticals that the individual required "unpredictable," unscheduled breaks

during the day, more than two times per week because of panic attacks. (Id.) The VE

10

testified that if the individual needed to leave the workplace because of the anxiety attack, then it would eliminate the job. (Id.) Further, if one-third of the time the individual was unable to concentrate or remain on-task, then the VE testified that the person's "ability to, to function at a competitive rate . . . could not sustain employment." (Id.)

## III. Conclusions of Law

### A. Scope of Review

In order for the Court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (internal quotes omitted). The Court must take into account evidence that fairly detracts from the ALJ's findings, as well as evidence that supports it. Id. (citing Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). The Court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

### B. ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation. See 20 C.F.R. § 404.1520(a)–(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987). The five steps are:

> (1) If the claimant is engaged in substantial gainful activity, disability benefits are denied.
> (2) If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

11

> (3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity.  If the impairment is equivalent to one of the listed impairments, the claimant is disabled.
>
> (4) If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past.  If the claimant is able to perform her previous work, she is not disabled.
>
> (5) If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Yuckert, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f)).

"To establish a disability claim, the claimant bears the intial burden of proof to show that he is unable to perform his past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)).  If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education, and work experience.  Id.

At the first step, the ALJ found Lacina had not engaged in substantial gainful activity since her alleged onset date of December 31, 2002.  (Tr. 10.)  The claimant "had a few short attempts at working" but the "jobs were part-time work and below the presumed substantial gainful activity level" for the years 2004, 2005, and 2006.  (Id.)  At the second step, the ALJ determined that Lacina had the following "severe impairments:" major depressive disorder, panic disorder, and attention deficit hyperactivity disorder.  (Id.)  The ALJ noted that Lacina's "[p]rogress notes indicate that when she is compliant with treatment and medication, the claimant's mental symptoms are controlled to a

12

moderate level" and that "her mental status worsens" when she misses her medication. (Tr. 11.)  At the third step, the ALJ determined that Lacina did not have an impairment or combination of impairments that meets or medically equals a listed impairment.  (Id.) The ALJ found that Lacina had "mild restriction in activities of daily living, mild difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace, and one to two episodes of decompensation, each of extended duration."  (Id.)   These restrictions did not cause two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation.  (Id.) At the fourth step, the ALJ determined that Lacina had the RFC to perform a full range of work at all exertional levels but with nonexertional limitations, such as one or two-step processes and only occasional changes in work routines.  (Tr. 12.)  The ALJ found that Lacina's failure to take her medication or "follow prescribed medical treatment is inconsistent with complaints of disabling mental symptoms."  (Id.)  The ALJ concluded that Lacina was "more mentally capable than alleged" because her daily activities and her ability to attend college "supports a conclusion that the claimant's impairments are not totally disabling." (Tr. 13.)  The ALJ found that the limiting effects of Lacina's symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment," and that Lacina had not provided "opinions regarding limitations . . . by any treating sources."  (Id.)

Based on the previous factors, the ALJ concluded that Lacina was unable to perform any past relevant work.  (Id.)  But based on a survey of jobs that exist in the national economy, the ALJ found that Lacina was not disabled because Lacina could perform work as an apparel stock checker, hotel/motel housekeeper, and small products assembler.  (Tr. 14–15.)  The ALJ concluded that Lacina was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  (Tr. 15.)

Lacina makes three arguments, all concerning the ALJ's determination of Lacina's

13

residual functional capacity assessment.  Lacina argues that the ALJ failed to consider her anxiety symptoms, causing her to miss or leave work early, and her difficulty with concentration and organization.

### C. ALJ's Medical Evidence Assessment

Lacina argues that the ALJ made factual errors in assessing the medical evidence as to her hospitalization and medication compliance.  Lacina argues that the ALJ did not properly consider the limitations that her inpatient hospitalizations and outpatient hospitalization programs would have on her work attendance and resulting RFC.  It is also an inaccurate statement of the record, Lacina asserts, that her symptoms were only "moderate" when she was medically compliant.  For example, Lacina suggests that her compliance improved when she was not working (due to lower stress levels) and that even on some occasions when Lacina was medically compliant, her medication was ineffective in controlling her panic attacks and anxiety.

The Commissioner argues that the ALJ's findings for medical evidence should be affirmed because the medical records do not substantiate her claims of disability.  Lacina's symptoms were controlled with medication, the Commissioner argues, and the ALJ properly accounted for both of Lacina's hospitalizations.  The record demonstrates that when Lacina was off her medication, her anxiety attacks increased, but that her GAF scores increased and her anxiety attacks decreased when she took her medication.  The ALJ also properly considered Lacina's one to two episodes of decompensation; however, even if there were extreme mental impairments during the hospitalization period, Lacina still saw significant improvement in her symptoms post-hospitalization.

When evaluating the medical evidence in the record, "a claimant [must] show that her impairment matches a listing, [and] it must meet *all* of the specified medical criteria." Jones v. Astrue, – F.3d –, 2010 WL 3396835, at *4  (8th Cir. Aug. 31, 2010) (emphasis

in original) (quoting <u>Brown ex rel. Williams v. Barnhart</u>, 388 F.3d 1150, 1152 (8th Cir. 2004)).  The disability, not the impairment, must have lasted or be expected to last for twelve months.  <u>Barnhart v. Walton</u>, 535 U.S. 212, 217 (2002).  Where an ALJ examines the evidence in the record, "observations of treating physicians and others, and an individual's own description of [her] limitations," then the claimant has received a "full and fair hearing."  <u>Id.</u> (quoting <u>Halverson v. Astrue</u>, 600 F.3d 922, 933 (8th Cir. 2010)).

"The ALJ has an obligation to consider the combined effect of a claimant's impairments."  <u>Gibson v. Sec. of Health & Human Servs.</u>, 882 F.2d 329, 331 (8th Cir. 1989) (citing 20 C.F.R. § 404.1522) (claimant's sister testified that claimant had a "long history of low stress tolerance, high dependency on family, and poor work attendance.").  While an ALJ may not ignore medical evidence, she must only show that she "evaluated all of the evidence before rendering a decision."  <u>Id.</u> (citations omitted).  A court may accord less evidentiary value to conclusory medical opinions, such as those in a checklist format.  <u>Holmstrom v. Massanari</u>, 270 F.3d 715, 721 (8th Cir. 2001).

In considering evidence such as absences from work, a claimant is "not required to document her absences," <u>Kelley v. Callahan</u>, 133 F.3d 583, 588 (8th Cir. 1998), but a court must give "careful consideration" to a claimant's "ability to find and hold a job in a [competitive] work environment," as "employers are concerned with substantial capacity, psychological stability, and steady attendance."  <u>Gavin v. Heckler</u>, 811 F.2d 1195, 1198 n.3 (8th Cir. 1987) (citing and quoting <u>Parsons v. Heckler</u>, 739 F.2d 1334, 1340 (8th Cir. 1984); <u>Thomas v. Celebrezze</u>, 331 F.2d 541, 546 (4th Cir. 1964)).  Where an ALJ seriously considers, but for good reasons explicitly discredits, a claimant's subjective complaints, the court will not disturb the ALJ's findings.  <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

Here, the ALJ found that Lacina was "hospitalized for a week in May 2005 for suicidal ideation and cutting," visited the hospital in July 2006 for a panic attack, and was

also admitted in April 2007 for overdosing on Lorazepam. (Tr. 11.) The ALJ later stated that "the record indicates that she has only been hospitalized on one occasion in May 2005, for suicidal ideation." (Tr. 12.) Insofar as Lacina's allegation that the ALJ failed to properly consider Lacina's hospitalization, the record reflects that the ALJ explicitly referred to the one hospitalization in the context of suicidal ideation. See Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008) (an arguable opinion-writing deficiency is not a basis for overturning an administrative finding, providing the deficiency has no bearing on the outcome).

While the record reflects Lacina had one to two episodes of decompensation, the record also suggests that Lacina's severe limitations improved following the hospitalizations. (Tr. 11–12.) For example, after Lacina's first hospital stay in May 26, 2005, she then spent three weeks in the partial hospitalization program and several weeks out of state. (Tr. 207, 432.) By July 20 2005, Lacina's affect appeared appropriate and reactive, despite having been out of Adderall for three weeks. (Tr. 432.) Additionally, Lacina stated at the therapy session that she had not been fired from her job due to hospitalization, but had quit during her hospitalization because "it was just too high anxiety." (Id.) She was briefly admitted to the hospital and released for one day due to a panic attack on July 26, 2006. (Tr. 221.) Lacina's next week-long hospitalization occurred on April 29, 2007. (Tr. 288.) She spent approximately one month in partial psychiatric hospitalization. (Tr. 304–23.) During these outpatient visits, she was observed as making good eye contact, alert, cooperative, and having essentially logical thoughts. (Id.) After this, her records reflect that she again stabilized fairly quickly with her therapist commenting that her "[i]nsight and judgment continue to improve." (Tr. 337–47.)

The ALJ made factual findings as to Lacina's mental condition when she is medication and treatment-compliant. The ALJ specifically acknowledged that Lacina had

been in counseling since 2002 for "mild to moderate depressive and anxiety symptoms." (Tr. 12.)  But in referring to the record, the ALJ noted that her "mental symptoms are controlled to a moderate level" when she is in compliance with her medication and treatment.  (Tr. 11.)  The ALJ stated that Lacina's "treating psychiatrist has opined no specific limitations from her impairments, [and] the State agency psychologists have indicated only moderate limitations."  (Tr. 13.)

There is substantial evidence in the record for the ALJ to have found that missing work due to hospitalization is not a frequent and recurrent situation.  The ALJ found that Lacina did have "one to two episodes of decompensation, each of extended duration," but that these episodes were not "repeated"[3] or "marked."[4]  (Tr. 11.)  Accordingly, the Court finds that the ALJ did not have to incorporate work absences in his hypothetical questions. See Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005) (finding that there was substantial evidence for ALJ to conclude degree of limitation was modest, despite a questionnaire from treating psychiatrist and nurse practitioner detailing marked impairment in claimant's ability to relate to people, attend daily living activities, remember work-like procedures, and to maintain regular work attendance).  Moreover, there is substantial evidence for the ALJ to conclude that Lacina's symptoms were controlled to a "moderate level" when she is both medication and treatment compliant.  (Tr. 11.)

The Court finds that the ALJ's factual findings as to the medical evidence are supported by substantial evidence in the record.

---

[3]"Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  (Tr. 11.)

[4]"A marked limitation means more than moderate but less than extreme."  (Tr. 11.)

### D. ALJ's Determination of Lacina's Medical Compliance

Lacina next argues that the ALJ erred in failing to properly evaluate her difficulty in complying with medical treatment.  Lacina asserts that the ALJ failed to demonstrate that compliance would restore her ability to work and that her failure to comply was without good cause.  She states that during a period of general compliance in 2007, Lacina's condition nevertheless deteriorated and she required hospitalization.  Lacina also argues that her noncompliance was with good cause because the noncompliance was a "symptom" of her mental illness.

The Commissioner argues that the ALJ did not find Lacina disabled because of her noncompliance, but instead used her noncompliance as a credibility factor for the severity of her symptoms.  The Commissioner asserts that, if the ALJ had found Lacina not disabled solely on the grounds of noncompliance, then the ALJ would not have proceeded onto step five of the sequential evaluation.  Lacina's noncompliance was not caused by her mental impairments, the Commissioner argues, because objective testing did not demonstrate abnormal memory or concentration abilities that would preclude Lacina from taking her medication.  Also, the Commissioner asserts that Lacina's ability to work during the relevant time period and her daily activities support a finding that Lacina could perform work-related activities.

A court may properly consider instances when claimants are noncompliant with medications or treatment.  Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001) (failure to comply with treatment recommendations properly considered by ALJ in credibility determination); Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 729-30 (8th Cir. 2003) (impairments controllable by medication do not support a finding of total disability).  An ALJ must, however, determine whether treatment-compliance would restore the claimant's ability to work.  Holley, 253 F.3d at 1092; 20 C.F.R. § 416.930.  "If an impairment can be controlled by treatment or medication, it cannot be considered

disabling." Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009) (internal quotations and citation omitted); compare Hutsell v. Massanari, 259 F.3d 707, 710 (8th Cir. 2001) (doctor assessed that claimant responded well to medication but was "still significantly impaired"), with Brown v. Astrue, 611 F.3d 941, 954 (8th Cir. 2010) (claimant's symptoms controlled with medication); Sultan v. Barnhart, 368 F.3d 857, 864 (8th Cir. 2004) (virtually all of claimant's medical providers reported that he was doing well on his medication as adjusted from time to time and that he was functioning at a reasonable level at school and at home).

When noncompliance is alleged to be a manifestation or result of a mental illness, a court should consider whether noncompliance is common among persons with such disorders.  For example, the Eighth Circuit has held that noncompliance can be a manifestation of schizophrenia disorder, see Pates-Fires v. Astrue, 564 F.3d 935, 946 (8th Cir. 2009), but is less likely to result from depression. See Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) (claimant also had trouble with her concentration and memory). A controllable impairment does not support a finding of disability, especially if the failure to follow a prescribed course of remedial treatment occurs without good cause.  Scales v. Barnhart, 363 F.3d 699, 705 (8th Cir. 2004); see also Dunahoo v. Apfel, 241 F.3d 1033, 1040 (8th Cir. 2001) (failure of claimant asserting severe depression to follow through with prescribed treatment can be basis for denial of social security benefits).  The ALJ may discount subjective complaints when they are inconsistent with the record as a whole. Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).  In fact, as long as the ALJ explains her findings, the ALJ need not believe all subjective complaints, especially "if there are inconsistencies in the evidence as a whole." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004) (citations and quotations omitted).

Lacina asserts that the ALJ never addressed the question of whether Lacina's mental impairment was the cause of her noncompliance.  Lacina asserts that her "good cause" for

19

her noncompliance was her mental impairment. Here, the ALJ found that, when Lacina was medically compliant, then her mental symptoms were "controlled to a moderate level;" but when she was noncompliant or missed therapy appointments, "her mental status worsens." (Tr. 11.) The ALJ noted that Lacina had been in counseling since 2002 for her mental symptoms, but:

> the record shows that there are many times where the claimant forgot to take her medications or missed appointments. The claimant's failure to follow prescribed medical treatment is inconsistent with complaints of disabling mental symptoms. Without good reasons, failure to follow prescribed treatment is grounds for denying an application for benefits.
> . . .
> While the claimant's treating psychiatrist has opined no specific limitations from her impairments, the State agency psychologists have indicated only moderate limitations in her ability to maintain attention and concentration for extended periods and respond appropriately to changes in the work setting. While the claimant's ADHD limits her concentration and attention, it is better with medication. Also, testing reveals her attention and concentration are within normal limits.

(Tr. 12–13.)

The record demonstrates Lacina was often alert and had logical and goal-directed thought processes, while also exhibiting good insight and judgment. (Tr. 216, 218, 250, 262.) She had slight to moderate attention, concentration, and memory, but her speech was intact. (Tr. 208, 302, 307, 311, 313, 315.) Her medical records indicate that her GAF scores, when not hospitalized, ranged from 50-55, 55, 55-60, 65, 65-70, 75, 80, and 85, which means that she had moderate, "some mild," and "no more than slight" impairments in her functional abilities. GAF scores are relevant evidence in evaluating a disability claim and compliance. See Brueggermann v. Barnhart, 348 F.3d 689 (8th Cir. 2003); Halverson, 600 F.3d at 930 (finding no impairment when GAF scores between 52 and 60, taken as a whole, indicated she had moderate symptoms of moderate difficulty in

social or occupational function); <u>Goff v. Barnhart</u>, 421 F.3d 785, 793 (8th Cir. 2005) (GAF scores between 51 and 60 contradict assertion of severe mental impairments; evidence in the record that "antidepressant medication helped her symptoms, and her medical records indicate she was stable on medication").   An ALJ should acknowledge GAF scores in a medical history summary or address mental residual functional capacity in hypothetical questions posed to the vocational expert.   20 C.F.R. § 404.1545 (to determine RFC, ALJ must consider all relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and claimant's subjective evidence of symptoms).   An ALJ may assign greater weight to testimony and medical evidence than to GAF scores.   <u>Jones</u>, 2010 WL 3396835, at *8 (citation omitted).

Lacina's treating physicians did not medically conclude that she was unable to work, <u>Brown v. Chater</u>, 87 F.3d 963, 964–65 (8th Cir. 1996), and her medical records suggest that her anxiety, depression, and ADD improved when she was medically compliant. (Tr. 254–57.)   <u>See</u> <u>Hensley v. Barnhart</u>, 352 F.3d 353, 356 (8th Cir. 2003) (subjective complaints not credited where doctors placed few, if any, functional limitations on claimant); <u>Smith v. Shalala</u>, 987 F.2d 1371, 1374 (8th Cir. 1993) (lack of any significant restrictions on claimant's activities by doctors inconsistent with claims of disabling conditions). Lacina's GAF scores do not appear to strongly correlate to her ability to be compliant with her medication.   For example, Lacina had a GAF of 80 on February 17, 2004, but she had been noncompliant with her medication and had also missed appointments at the CMHC. (Tr. 442.)   Likewise, on July 20, 2005, Lacina had forgotten to take her Zoloft and had been out of her Adderall medication for three weeks, but still had a GAF of 75. (Tr. 432.)   Even when she was receiving detailed treatment and monitoring in outpatient psychiatric care, Lacina still had problems remembering to take her medication. (Tr. 322.)   A neuropsychiatric evaluation performed in July of 2005 concluded that Lacina was "performing adequately without medication." (Tr. 203.)   In

fact, when she was in a medically compliant period, Lacina had a good semester at college. (Tr. 343.)

Lacina's panic attacks seemed to occur with increasing frequency when she was off her medication. On May 10, 2004, she reported to Dr. Sheff that she had been off Adderall for a week and "had 4 anxiety attacks." (Tr. 437.) Lacina was also inconsistent with explaining the frequency of her attacks; for example, on April 29, 2007, she told medical professionals that the panic attacks occurred "only occasionally, about once a month," and then on May 4, 2007, she stated that her attacks occurred twice per month. (Tr. 298, 304.) The record is inconclusive as to why Lacina's panic attacks increased between August of 2007, and the date of the hearing, but her treating physician noted that "[i]t does not sound like the anxiety was a full-blown panic at the time she was having it." (Tr. 339, 341.) Lacina had approximately a six-month period when she did not report having panic attacks to her psychiatrist, from between November 8, 2007 and May 1, 2008. (Tr. 341–47.)

The Court finds that the ALJ properly considered the improvements in Lacina's mental processes when she was in compliance. There is substantial evidence in the record that Lacina may not have been entirely credible that her failure to take her medication and attend appointments was a result of her mental impairments. No treating physician opined that Lacina's inability to remain in treatment and medical compliance was due to her mental impairments. To the contrary, there are numerous statements in the record that medical professionals believed that consistency in medication and treatment would be highly beneficial. (Tr. 201–03, 247, 427.) The ALJ did not conclude that because Lacina was not medically compliant that she was not disabled; rather, the ALJ concluded that Lacina had "severe" to "moderate" impairments, but that these impairments could be controlled through medication.

Thus, the Court finds that this record does contain substantial evidence supporting

the ALJ's finding of no disability.

## E. ALJ's Assessment of Third Party Evidence

Finally, Lacina argues that the ALJ erred in failing to review and address evidence from third parties.  Lacina asserts that the ALJ failed to consider a Work Performance Assessment ("WPA") submitted from a former employer, Donald Morrison, when she worked at Pet Degree in 2002 and 2003.  Also, that the ALJ disregarded testimony from Janice Cohenour, Lacina's assisted living caseworker.  Lacina argues that the evidence from these third-party sources demonstrate the severity of her impairment and that the ALJ "failed to articulate any reason for rejecting" this evidence.  Lacina argues that Cohenour and Morrison are non-medical sources, according to Social Security Ruling 06-3p, 20 C.F.R. § 404.1502, and 416.902, and an ALJ can use information from these sources to "show the severity of the individual's impairment" SSR 06-3p.  Lacina asserts that the ALJ should have considered the opinions of Cohenour and Morrison or explained why she discredited the testimony.

The Commissioner argues that the ALJ's discussion of the record was sufficient because an ALJ need not discuss or reference every piece of evidence submitted.  Specifically, the Commissioner asserts that Mr. Morrison's WPA is contradicted by medical opinions during the same time period because Lacina exhibited only mild to moderate limitations.  Also, that despite Mr. Morrison's assertion that he would not hire Lacina again until her condition improved, he had, in fact rehired her during the relevant time period.  Furthermore, the Commissioner asserts that the ALJ did comment on Janice Cohenour's testimony in the decision.  The Commissioner, in looking at the record as a whole, argues that Lacina could do activities independently that Ms. Cohenour sometimes helped her with, and that Lacina attended school and worked part-time without Ms.

Cohenour's assistance.  Lastly, the Commissioner argues that the ALJ's conclusion that Lacina was not disabled is supported by the recommendations from state agency medical consultants because they stated that Lacina only had moderate and some mild limitations.

An ALJ is not required to discuss all evidence and a failure to cite specific evidence does not mean it was not considered.  Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (citation omitted); Miller v. Shalala, 8 F.3d 611, 613 (8th Cir. 1993) ("In denying disability, the ALJ does not have to discuss every piece of evidence presented, but must develop the record fully and fairly.") (citations omitted).  For example, where a claimant suffered from hydrocephalus, the court found that the ALJ did not have to discuss the opinions of a claimant's teachers as to his abilities, in formulating his RFC assessment  England v. Astrue, 490 F.3d 1017, 1022 (8th Cir. 2007).  The court found that the teacher's responses "do not necessarily comprise the entirety of this domain."  Id.

Here, as to daily living activities, the ALJ found that Janice Cohenour "testified that she assists the claimant with mail, shopping, completing applications, and paying bills." (Tr. 13.)  The ALJ found that Lacina's activities of housekeeping, keeping appointments, reading, drawing, spending time with friends and family, and the "ability to attend college further supports a conclusion that the claimant's impairments are not totally disabling." (Id.)  The ALJ did not comment on the WPA from Donald Morrison.  While the symptoms could be reasonably expected to cause Lacina's alleged symptoms, the ALJ found that "the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (Id.)  The ALJ also noted that treating sources did not provide any opinions on Lacina's mental limitations, rather, that the opinions from the state psychologists were consistent with the overall record and should be given weight.  (Id.)

Lacina argues that the ALJ should have considered the statements from Mr. Morrison for her work at Pet Degree. Lacina worked at Pet Degree from 1995 through 1999, from July 2001 through November 2002, and from March 2003 through December 2003. (Tr. 198.) Mr. Morrison indicated in his WPA that Lacina had a poor ability to concentrate and remain on task, to adhere to schedules, to manage workplace stress, and to manage personal stress while in the workplace. (Tr. 198–99.) He stated that Lacina's ability to handle stress and stay focused was poor and that she needed frequent supervision or reminders to stay on task. (Tr. 199.) She also had frequent absences and could not handle increased responsibility. (Id.) Mr. Morrison stated that he would hire Lacina again if she was able to control her anxiety and if her ability to handle stress improved. (Id.)

The Court finds that the ALJ did incorporate Cohenour's testimony into her findings (Tr. 13) and did not need to recite Cohenour's testimony with additional specificity or refer to Morrison's WPA. Miller, 8 F.3d at 613. There is substantial evidence that the ALJ, while recognizing Cohenour's occasional assistance, found that Lacina also did many of the assisted activities on her own when Cohenour was not available. (Tr. 13.) Therefore, it was not necessary for the ALJ to make specific findings as to the degree of help Cohenour provides, since Lacina's testimony confirms her otherwise independence outside of Cohenour's weekly visits. "In evaluating a claimant's RFC, consideration should be given to the quality of the daily activities and the ability to sustain activities, interests, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities must also be considered." Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original); Brown, 611 F.3d at 954 (finding of no disability where claimant was involved in family activities, "takes care of her own personal needs, prepares meals three times a week, does the laundry, shops for groceries, drives, pays bills, and talks with others on the telephone a couple times a week."). However, "a person's ability to engage in

25

personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." Kelley, 133 F.3d at 589 (citing Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir. 1995)).

But here, the ALJ properly considered Lacina's activity level, gleaned through Lacina's testimony and the record as a whole, to determine that "[t]hese activities suggest that she is more mentally capable than alleged." (Tr. 13.) "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009) (quoting Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001)). Despite Cohenour's help, there is substantial evidence in the record that Lacina lived largely independently. The ALJ recognized that Lacina's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent". (Tr. 13.)

Moreover, it is not error that the ALJ did not consider Morrison's statements regarding Lacina's work at Pet Degree. Lacina largely worked for Pet Degree before her alleged onset date, and when she did return to work, it was during a period when Lacina had mild to moderate limitations. (Tr. 426, 445.) Morrison had stated he would not rehire Lacina, but during her work at Pet Degree, she had mostly satisfactory feedback. (Tr. 198–99.) Morrison's statements work against Lacina because his work assessment indicates that, while Lacina may not have been capable of a managerial position, she seemed to do sufficiently well in a non-supervisor capacity. See Heino, 578 F.3d at 881. Morrison's statements suggest that when Lacina is in compliance with her medication and treatment, she is capable of working. It was not error for the ALJ to omit Morrison's statements from her findings. See Craig, 212 F.3d at 436.

26

The Court finds that there is substantial evidence that the ALJ properly considered third-party testimony and statements in making her finding of no disability.

## V. CONCLUSION

The ALJ's decision denying disability benefits is supported by substantial evidence in the record as a whole and must be affirmed.

Upon the foregoing,

**IT IS ORDERED**

That the decision of the ALJ is hereby affirmed.  The Clerk of Court shall enter judgment accordingly.

**DATED** this 17th day of September, 2010.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA